UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
BARRY WILKINS,

Plaintiff,

-against-

UNITED PARCEL SERVICE, INC., dba UPS, UNITED PARCEL SERVICE OF AMERICA, INC., and CHRISTOPHER VALENT,

Defendants.
---------------------------------------------------------X

Civil Action No.:

VERIFIED COMPLAINT

Electronically Filed

Plaintiff Barry Wilkins, by and through his attorney, Jennifer S. Echevarria, Esq., hereby complains of the Defendants as follows:

**THE PARTIES**

1. At all relevant times herein, Plaintiff Barry Wilkins ("Plaintiff") maintained a residence in the Town of New Windsor, County of Orange, State of New York.

2. At all relevant times herein, Defendants United Parcel Service, Inc., dba UPS, and United Parcel Service of America, Inc. (collectively referred to as "UPS" or "Defendants UPS"), maintained a joint office at 139 Wembly Road, Town of New Windsor, County of Orange, State of New York 12553-5536 (the "New Windsor Location").

3. At all relevant times herein, Defendant United Parcel Service, Inc., dba UPS, was a foreign business corporation authorized to do business by the New York Department of State with an address for service of process at C/O Corporation Service Co., 80 State Street, Albany, New York 12207-2543.

4. At all relevant times herein, Defendant United Parcel Service of America, Inc., was a foreign business corporation with headquarters located at 55 Glenlake Parkway, Northeast, Atlanta, Georgia, 30328.

5. Upon information and belief, Defendant United Parcel Service, Inc., dba UPS is a subsidiary and/or franchisee of the national company United Parcel Service of America, Inc.

6. Upon information and belief, Defendants UPS jointly employed Plaintiff at the New Windsor Location from May 1996 to the present date.

7. Upon information and belief, Defendants UPS are employers, as that term is defined in Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981, and as it is defined in New York State Human Rights Law §290, *et seq.*, as Defendants UPS employ thousands of workers nationally, well above the fifteen (15) and four (4) employee-thresholds contained in those statutes, respectively.

8. Upon information and belief, Defendants UPS had more than five hundred (500) employees in each of twenty (20) or more calendar weeks in the current or preceding calendar years.

9. Upon information and belief, Defendants UPS have over one hundred (100) employees at the New Windsor Location and had more than fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks in the current and preceding calendar years.

10. Upon information and belief, Defendant Christopher Valent ("Defendant Valent") lives in Pompton Plains, Town of Pequannock, State of New Jersey, and is employed by Defendants UPS at their office located at 799 Jefferson Road, Parsippany, New Jersey, 07054.

11. Defendant Valent was Plaintiff's immediate UPS supervisor at the New Windsor Location from approximately August 2015 through May 2017.

**JURISDICTION AND VENUE**

12. Jurisdiction is appropriate under 28 U.S.C. §1331 as this action pertains to violations of Federal Law, to wit, Title VII of the Civil Rights Act of 1964 located at 42 U.S.C. 2000e, *et seq.*, 42 U.S.C. 1981, as well as violations of the New York State Human Rights Law §290, *et seq.*, which can be heard by this Court pursuant to 28 U.S.C. §1367.

13. Venue is based on the place of business of the Defendants and the place where the acts and occurrences complained of herein occurred, and is appropriate in this District pursuant to 28 U.S.C. §§ 112(b) and 1391(b).

**STATEMENT OF FACTS**

14. Plaintiff is an African American male measuring six feet, one inch (6'1''), weighing two hundred fifty (250) pounds.

15. Plaintiff began working for UPS as a Package Car Driver in May 1996.

16. By the year 2002, Plaintiff was operating his own route and for the next thirteen (13) years he had a good record of performance relatively absent of any disciplinary warnings.

17. This immediately changed in August 2015, when Defendant Valent began working at the New Windsor Location as Plaintiff's direct supervisor.

18. Defendant Valent was a supervisor with the power to hire, fire, promote, demote and/or discipline or recommend for discipline without the need to obtain approval from others.

19. It became immediately apparent that Defendant Valent did not care for Plaintiff nor the one (1) and only other Black, full-time driver at the New Windsor Location.

20. Defendant Valent immediately started treating Plaintiff, the other Black driver, and the four (4) Latino drivers very differently from the Caucasian drivers.

21. For example, Defendant Valent frequently gave Caucasian workers preferential treatment in days off requests, in determining whether or not to issue discipline, and in general conditions of employment.

22. One incident of preferential treatment occurred in or shortly after August 2015 when Defendant Valent began to harass Plaintiff on an almost daily basis for what Valent claimed were infractions of the UPS dress and conduct codes, but Valent would not similarly discipline the Caucasian workers for committing the same petty infractions.

23. In one particular incident, Defendant Valent disciplined Plaintiff for wearing black sneakers to work because they were "inappropriate" although he could not specify why they were inappropriate, and because one of the laces had accidently un-tied; meanwhile, Caucasian workers (including one that was standing close by to Valent and Plaintiff at the time) had running sneakers or worse footwear on but were not similarly disciplined.

24. In another example of disparate treatment, during the bitter cold winter of 2016, when a Caucasian driver named "Paul" complained to Defendant Valent that his truck's heat was not working and that the truck's door would not close, Defendant Valent ordered that Plaintiff and Paul's trucks be switched causing Plaintiff to drive around for several weeks in the middle of winter with a broken door and no heat.

25. Another incident of discriminatory treatment occurred when, in early 2016, Defendant Valent was watching Plaintiff in the UPS computer room through a monitor and attempted to discipline Plaintiff for sitting down while he was doing a work training that UPS required to be completed by the end of the day, meanwhile a Caucasian worker named "Mike" was

sitting and twirling in a chair at the other end of the room, not even doing his training, yet Defendant Valent did not attempt to discipline him.

26. Yet another incident of disparate treatment and discrimination occurred in or around February 2016 when Plaintiff mentioned to Defendant Valent that he had accidentally gotten tire marks on the forested property of a customer; while such an incident is usually considered to be a very minor infraction (especially where, as here, the customer had not complained), Defendant Valent wrote Plaintiff up for termination for allegedly causing an "accident" yet three (3) months later, when a Caucasian driver named "Mokely" backed into another employee's car with a 24-foot truck and failed to report it, Defendant Valent did not write up Mockely for discipline and did not consider that to have been an "accident."

27. These petty write-ups, plus others such as failing to use the handrail when entering his truck, failing to put his seatbelt on prior to moving the truck, etc., were used by Defendant Valent in an attempt to terminate Plaintiff in April 2016.

28. Plaintiff filed a grievance to oppose his termination and the matter went to arbitration before Arbiter J.J. Pierson.

29. Arbiter J.J. Pierson found, in an Opinion and Award dated April 21, 2016, that Plaintiff had a twenty-one (21) year record of good performance that was relatively absent of disciplinary warnings and that termination for a small number of petty infractions was "far too severe for a driver completing nearly 200 deliveries each day and unreasonable in light of his long employment term."

30. In pursuing his grievance, Plaintiff and his union's attorney had defended against the termination by, in part, implying that there was racial animus driving Defendant Valent's attitude towards Plaintiff and his excessive, unwarranted discipline.

31. Even though Plaintiff's concerns were made obvious to UPS's attorney in that grievance, and even though Plaintiff ultimately succeeded in that grievance, UPS failed to take any actions to protect Plaintiff from further discrimination.

32. In fact, after the April 2016 grievance hearing, Defendant Valent's discriminatory treatment of Plaintiff became worse.

33. The initial and then increased incidents of petty discipline were motivated by Plaintiff's race and color, and the escalation of that treatment further served as retaliation for Plaintiff's objection to being treated unfairly by his filing of a grievance and raising discrimination concerns.

34. One day in June 2016, Defendant Valent and Plaintiff were discussing overtime when Valent retorted that he knew Plaintiff needed the overtime because he saw the "whips" Plaintiff drove.

35. Plaintiff understood that to be a derisive statement of resentment of Plaintiff's financial position as a Black male given the tone and the use of the term "whip" (which is a slang term used by some African Americans to refer to their automobiles); Plaintiff had never referred to his cars with that term and was offended that Valent addressed him in that way.

36. Although Plaintiff filed a grievance for this offensive incident, upon information and belief, to this day UPS has not taken any action to address Valent's insulting, racist comment.

37. Plaintiff also called the UPS "Integrity Hotline" to report Valent's offensive conduct and incidents of disparate treatment on the basis of race, speaking to someone named "Reggie," yet, upon information and belief, UPS has never disciplined Defendant Valent in any way, required him to take sensitivity training, or apologized to Plaintiff for the years that he endured these humiliating and belittling conditions of employment.

38. When Plaintiff thought the discrimination and disparate treatment could not get any worse, on June 17, 2016, it did.

39. On said date, Plaintiff had been issued four (4) write-ups by Defendant Valent for more petty infractions that Plaintiff had allegedly committed while on a supervised ride (called an "On Job Supervision" or "OJS") on June 10, 2016.

40. On the morning of June 17, 2016, Plaintiff met with Defendant Valent, Supervisor Steve Callagy, and Plaintiff's shop steward, Dave Scala, to address those infractions before the start of Plaintiff's shift.

41. After the meeting, Plaintiff moved his truck outside so that he could perform the truck inspection required prior to starting his shift.

42. While inspecting the truck, Plaintiff (believing he was having a private, legally protected conversation with his shop steward) was venting his frustration over what he felt to be incessant racist harassment by Defendant Valent and in expressing his frustration Plaintiff said something to the effect of: "what does someone have to do, slit or punch someone's throat to get them to listen?"

43. Unbeknownst to Plaintiff, Defendant Valent had followed Plaintiff to continue to badger him about the write-ups and had inadvertently heard the comment.

44. Defendant Valent came closer to Plaintiff to confront him over the comment, at which point Plaintiff asked to speak to Defendant Valent privately at the back of his truck.

45. During the private conversation between Plaintiff and Defendant Valent, Plaintiff told Valent that although it was a crass comment, he did not have a knife and had no intention of threatening or hurting him or anyone.

46. Although Defendant Valent appeared to accept Plaintiff's apology, Valent instructed Plaintiff to go into the building and wait while he made a phone call.

47. Suddenly, to Plaintiff's surprise and shock, several police cars pulled up in front of the UPS building and four (4) police officers exited their cars and entered the buidling with guns drawn, looking for Plaintiff.

48. Plaintiff, being a relatively large, Black man living in a political climate where racial tensions run high between Black males and the police, and where it is not uncommon for unarmed Black men to be shot and killed by police when accused of having a weapon, was absolutely terrified for his life.

49. Not only was Plaintiff extremely frightened of being killed, he was also extremely embarrassed given that he had earned a position of respect amongst his colleagues after twenty (20) plus years at UPS, and this scene (where he was made to look like a criminal) was unfolding before everyone's eyes.

50. In addition, Plaintiff was embarrassed for his family because the Town of New Windsor is a small municipality where everyone knows each other, and many Town workers knew his wife given that she had worked at Town Hall for years prior to this incident.

51. The embarrassment of being approached by police with guns drawn at his place of employment was extremely degrading and humiliating for Plaintiff in addition to being a traumatic experience of thinking he could be killed without being able to say goodbye to his wife and children.

52. By the grace of God, the police officers recognized Plaintiff from his years of coaching sports teams for kids in their community and they put their guns away.

53. This incident left Plaintiff shaken and afraid, embarrassed and humiliated before his colleagues and community, and has resulted in Plaintiff's difficulty breathing, sleeping, trusting others, and eating, has made him irritable and less social, angry, resentful, discouraged, stressed, anxiety-ridden, and depressed, for which Plaintiff has sought psychotherapy.

54. As a result of this incident, Plaintiff's reputation at work has gone from being a respected senior employee to a "troublemaker" or criminal that needs to be avoided.

55. As a result of this incident, Plaintiff's reputation in his community was diminished as rumors began spreading around town regarding the incident and Plaintiff started feeling avoided and shunned by his neighbors and friends.

56. Upon information and belief, Defendant Valent never actually felt threatened by Plaintiff and merely called the police in an attempt to get Plaintiff fired, get criminal charges pressed against him, and to put him through a traumatic experience with the police all because of Plaintiff's race and in retribution for objecting to the discriminatory treatment he was being subjected to.

57. Defendant Valent was successful in two out of his three objectives in that Plaintiff was undoubtedly traumatized by the experience with the police, and he was also terminated from his employment at UPS.

58. Plaintiff's union grieved the termination on his behalf and the parties went to arbitration.

59. In arbitration, the administrative law judge (ALJ) that was the arbiter of the dispute was able to interview witnesses and view the UPS surveillance video of the incident.

60. The ALJ ultimately found in Plaintiff's favor, concluding that Defendant Valent could not have reasonably felt threatened by Plaintiff given that Plaintiff's comments were not

made to Valent directly but were made in a private conversation to a union representative where Plaintiff was blowing off steam.

60. Further, the ALJ noted that Defendant Valent's call to the police was misleading at best and insinuated that the call was made with ulterior motives.

61. Moreover, the ALJ found that UPS had not established cause for termination and ordered UPS to re-hire Plaintiff with back-pay for the ten (10) weeks that Plaintiff had been terminated.

62. Unfortunately, the ten (10) weeks of back-pay only accounted for a forty (40) hour work week and did not include the at least ten (10) hours of overtime that Plaintiff almost always works every week at a rate of fifty one dollars ($51.00) an hour, causing him to lose at least five thousand one hundred dollars ($5,100.00) in overtime pay.

63. Upon information and belief, Defendant UPS negligently failed to instruct Defendant Valent that he could not retaliate against Plaintiff for making a claim of discrimination and grieving his termination, because Defendant Valent's poor treatment of Plaintiff not only continued but became worse.

64. For instance, while Plaintiff was terminated and out of work at the end of the June 2016, Defendant Valent issued him a write-up for an incident that allegedly occurred months earlier on February 2, 2016; said write-up was ultimately found to be unsubstantiated.

65. On September 29, 2016, Plaintiff was issued another write-up for failure to follow safety methods, procedures and instructions when the back door of a 24-foot truck popped open while he was still on UPS property, even though Plaintiff was not yet on the road, closed the door immediately, and no packages fell out.

66. On that same day, a Caucasian driver named "Rosenberger" was observed with packages in the cab of his truck (which is an offense) yet he received no disciplinary action or write-ups from either Defendant.

67. In addition, in or about December 2016, a Caucasian mechanics supervisor named "Ken" was videotaped picking up packages off the road that he had been transporting and had fallen out of the truck, which is a disciplinary offense given that he is not a driver and he allowed the packages to fall out of the truck, yet "Ken" was not written up by Defendants UPS or Valent.

68. Defendant Valent had supervisory authority over both "Rosenberger" and "Ken" and had the authority to write them up for these infractions.

69. On November 17, 2016, Plaintiff followed proper procedure to request a day off but he was told that he could not take a day off during "peak season" even though peak season did not technically start until after Black Friday, i.e., November 28, 2016.

70. That same week, the Caucasian driver named "Rosenberger," who has less seniority than Plaintiff, was permitted by Defendant Valent to take two (2) days off.

71. On January 3, 2017, Plaintiff had a stomach virus and came off the road sick, and his supervisor that day named "James" approved him to go home sick and take a sick day the following day.

72. On January 5th, Plaintiff returned to work with a doctor's note excusing him from work until January 6th but Plaintiff returned one (1) day earlier because he felt better.

73. That same day, i.e., on January 5th, Plaintiff received a warning letter from Defendant Valent critiquing his allegedly poor attendance and one of the days that Valent had marked Plaintiff as being out was August 29, 2016, which was a date that Plaintiff was still on forced leave and "terminated" as a result of the June 17th incident.

74. On January 26, 2017, Plaintiff was issued two (2) Notices of Discharge for again failing to follow methods, procedures and instructions on January 25th and 26th: one for leaving a package on his truck (which Plaintiff did not do), and the second for allegedly not communicating with the switchboard that he would not be able to make it to a letterbox by 7:45 pm (which Plaintiff had done earlier that afternoon).

75. In fact, between the time period that Plaintiff returned from termination in September 2016 up to February 2017, Plaintiff had been issued fourteen (14) Notices of Discharge by Defendant Valent or at his command; during the entire time period that Defendant Valent supervised Plaintiff, Plaintiff received at least thirty one (31) written notices of discipline from Defendant Valent or at his behest.

76. In the total twenty-three (23) years that Plaintiff has worked for Defendant UPS, over sixty percent (60%) of Plaintiff's write-ups and Notices of Discharge occurred between August 2015 (when Defendant Valent started supervising Plaintiff) and May 2017 (when Defendant Valent was transferred to another location).

77. Stated differently, although Plaintiff has worked for the same company for twenty-three (23) years, he received most of his write-ups (sixty-two percent (62%) to be exact) in a span of only one (1) year and nine (9) months.

78. On February 15, 2017, a union grievance hearing was held to address the new fourteen (14) Notices of Discharge.

79. At that hearing, Plaintiff's union's business agent remarked that he had never seen one person get so many write-ups in such a short period of time.

80. The result of that hearing was that, comparing the number of infractions to the number of stops/jobs that Plaintiff completed during that period, the ALJ found that Plaintiff was

ninety-six percent (96%) effective at performing his job and that the write-ups were unsubstantiated.

81. Nonetheless, on February 20, 2017, Defendant Valent again called Plaintiff into his office to be questioned about a delivery and questioned about his attendance and personal days, and Plaintiff was told to be prepared to be called into the office again the next day as he was doing an "on-going investigation" on Plaintiff.

82. Upon information and belief, Defendant Valent said that to Plaintiff and wrote him up so many times because of Plaintiff's race and in retaliation for Plaintiff's complaints about discrimination and his refusal to accept the unfair and unjust treatment that he was being subjected to.

83. Upon information and belief, Defendant Valent created a hostile work environment for Plaintiff because of Plaintiff's race.

84. Upon information and belief, all employees and supervisors at the New Windsor Location, including Defendant UPS, are aware that Defendant Valent is a racist who would treat Plaintiff and the only other African American employee at that Location, poorly compared to the Caucasian employees.

85. Upon information and belief, Defendant UPS was aware, or should have been aware, of the racially-hostile work environment given that it was so continuous and pervasive, occurred on a nearly daily basis, included such frequent incidents of discipline many of which went to grievance hearings where discrimination was raised and Plaintiff's write-ups were found to be unsubstantiated, and on several occasions Plaintiff verbally and in writing complained to management about the discrimination, disparate treatment, hostile work environment, and retaliation.

86. During the years 2016, 2017, and most recently in the year 2019, Defendant UPS has been in the national news for allowing discrimination based on race to occur at other UPS locations and therefore it is not surprising that Defendant UPS did not do anything to protect Plaintiff from the racially-hostile work environment he was subjected to for almost two (2) years.

87. Although Defendant Valent transferred to another location in or around May 2017, upon information and belief Defendant Valent was never terminated and did not face any discipline for his treatment of Plaintiff.

88. Therefore, while Plaintiff now has a tarnished employment record due the heightened scrutiny of his work and all of the unjustified write-ups he received from Defendant Valent, Defendant Valent is allowed to continue to enjoy a clear record of employment with no consequences to his seniority, salary or esteem at UPS.

89. Plaintiff's tarnished employment record and reputation at work continues to effect his career at UPS, his salary, and his relationships with his supervisors and colleagues.

90. Although Defendant UPS has an Anti-Discrimination Policy, UPS failed to implement it in Plaintiff's case and has never done anything to address the situation or to prevent it from happening again.

91. On April 13, 2017, Plaintiff timely filed a charge of discrimination on the basis of race and color with the Equal Employment Opportunity Commission ("EEOC"); a true and correct copy of said Charge with accompanying Complainant's Affidavit is annexed hereto as Exhibit "A."

92. On October 23, 2017, Plaintiff filed a Complainant's Rebuttal Affidavit with the EEOC; a true and correct copy of said Rebuttal Affidavit is annexed hereto as Exhibit "B."

93. On May 9, 2019, the EEOC determined that there was reasonable cause to believe that violations of the law had occurred and that Defendants had discriminated against Plaintiff; a true and correct copy of the EEOC Determination is annexed hereto as Exhibit "C."

94. On June 12, 2019, Plaintiff received the EEOC's Right to Sue Letter dated June 7, 2019; a true and correct copy of said Right to Sue Letter is annexed hereto as Exhibit "D."

95. This action is timely as it has been initiated within ninety (90) days of Plaintiff's receipt of the above mentioned Right to Sue Letter.

**PLAINTIFF'S FIRST CLAIM FOR HOSTILE WORK ENVIRONMENT AND DISCRIMINATION UNDER TITLE VII**

96. Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "95" as though fully set forth at length herein.

97. Title VII of the Civil Rights Act of 1964 establishes that it is an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race or color.

98. Defendants knowingly and in bad faith created and have allowed to continue a hostile work environment permeated with discrimination on the basis of race and color wherein Plaintiff is constantly written up for petty discipline and threatened with termination due to his race and color while his Caucasian co-workers are not similarly written up for the same behavior.

99. Defendants have created such a hostile environment for Plaintiff in an effort to make the workplace so intolerable that he will quit.

100. The poor treatment that Plaintiff was and continues to be subjected to, and the knowledge that UPS never valued Plaintiff enough to acknowledge culpability or to protect

Plaintiff, has the effect of unreasonably interfering with his work performance and creates an intimidating, hostile and offensive working environment for him.

101. The write-ups that Plaintiff has received during Defendant Valent's reign as supervisor have had an impact on Plaintiff's career at UPS in that they have prevented him from earning a higher salary, earning a higher title/position, and have put him in a precarious employment position in that anything that he does wrong puts him in jeopardy of being terminated given his record.

102. When Defendant Valent was still supervising Plaintiff, the discrimination and harassment occurred on a nearly daily or weekly basis.

103. The acts of discrimination and harassment complained of are part of one unlawful discrimination practice.

104. The discrimination and harassment are so pervasive and continuous so as to create a hostile work environment.

105. Defendant UPS has failed to ensure that supervisors such as Defendant Valent are properly trained and exposed to UPS's antidiscrimination policy.

106. Defendant UPS failed to follow its own antidiscrimination policy in this case in either investigating Plaintiff's complaints or in reprimanding Defendant Valent.

107. The incidents of discrimination directed at Plaintiff by Defendants both before and after the June 17, 2016, incident are sufficiently related to constitute part of the same actionable hostile work environment practice and therefore should be considered part of this claim.

108. Plaintiff has not previously initiated a complaint for the relief claimed herein before any other court.

109. Therefore, Plaintiff respectfully requests affirmative relief, back pay, lost future wages, compensatory damages, punitive damages, attorneys' and experts' fees, costs and disbursements, and such other and further relief that this Court deems just and proper.

**PLAINTIFF'S SECOND CLAIM FOR HOSTILE WORK ENVIRONMENT AND DISCRMINATION UNDER NYSHRL**

110. Plaintiff repeats and realleges each and every allegation stated or contained in Paragraphs "1" through "109" above as though fully set forth at length herein.

111. Section 296 of New York State Human Rights Law ("NYSHRL") establishes that it is an unlawful discriminatory practice for an employer, because of an individual's race or color, to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

112. Defendants knowingly and in bad faith created and have allowed to continue a hostile work environment permeated with discrimination on the basis of race and color wherein Plaintiff is constantly written up for petty discipline and threatened with termination due to his race and color while his Caucasian co-workers are not similarly written up for the same behavior.

113. Defendants have created such a hostile environment for Plaintiff in an effort to make the workplace so intolerable that he will quit.

114. The poor treatment that Plaintiff was and continues to be subjected to, and the knowledge that UPS never valued Plaintiff enough to acknowledge culpability or to protect Plaintiff, has the effect of unreasonably interfering with his work performance and creates an intimidating, hostile and offensive working environment for him.

115. The write-ups that Plaintiff has received during Defendant Valent's reign as supervisor have had an impact on Plaintiff's career at UPS in that they have prevented him from earning a higher salary, earning a higher title/position, and have put him in a precarious

employment position in that anything that he does wrong puts him in jeopardy of being terminated given his record.

116. When Defendant Valent was still supervising Plaintiff, the discrimination and harassment occurred on a nearly daily or weekly basis.

117. The acts of discrimination and harassment complained of are part of one unlawful discrimination practice.

118. The discrimination and harassment are so pervasive and continuous so as to create a hostile work environment.

119. Defendant UPS has failed to ensure that supervisors such as Defendant Valent are properly trained and exposed to UPS's antidiscrimination policy.

120. Defendant UPS failed to follow its own antidiscrimination policy in this case in either investigating Plaintiff's complaints or in reprimanding Defendant Valent.

121. The incidents of discrimination directed at Plaintiff by Defendants both before and after the June 17, 2016, incident are sufficiently related to constitute part of the same actionable hostile work environment practice and therefore should be considered part of this claim.

122. Plaintiff has not previously initiated a complaint for the relief claimed herein before any other court.

123. Therefore, Plaintiff respectfully requests affirmative relief, back pay and lost future wages, compensatory damages, costs and disbursements, and such other and further relief that this Court deems just and proper.

**PLAINTIFF'S THIRD CLAIM FOR INTENTIONAL DISCRMINATION UNDER 42 U.S.C. 1981**

124. Plaintiff repeats and realleges each and every allegation stated or contained in Paragraphs "1" through "123" above as though fully set forth at length herein.

125. Federal Law under 42 U.S.C. 1981 provides that all persons in the United States shall have the same right in every State to the full and equal benefit of all laws and proceedings for the security of persons as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

126. The rights protected under 42 U.S.C. 1981 are protected against impairment by nongovernment entities, including by Defendants.

127. Plaintiff has been intentionally discriminated against by Defendants, deprived of the full and equal benefit of the laws, and subject to punishments and unjust treatment that Caucasians are not subject to, all on the basis of his race, and has been damaged thereby.

128. Plaintiff has not previously initiated a complaint for the relief claimed herein before any other court.

129. Therefore, Plaintiff respectfully requests affirmative relief, back pay, lost future wages, compensatory damages, punitive damages, attorneys' and experts' fees, costs and disbursements, and such other and further relief that this Court deems just and proper.

**PLAINTIFF'S FOURTH CLAIM FOR RETALIATION UNDER TITLE VII**

130. Plaintiff repeats and realleges each and every allegation stated or contained in Paragraphs "1" through "129" above as though fully set forth at length herein.

131. Title VII of the Civil Rights Act of 1964, at 42 USC Section 2000e-3(a), makes it an unlawful employment practice for an employer to discriminate against any of its employees because the employee has opposed any practice made an unlawful employment practice by Title VII of the Civil Rights Act, or because the employee has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under Title VII of the Civil Rights Act.

132. Plaintiff engaged in protected activity under Title VII by opposing discrimination and hostile work environment when he grieved the unjustified discipline he was being subjected to wherein he, his union attorney, and the arbiter raised discrimination and racism as a motivator for the excessive discipline.

133. Each time Plaintiff filed a grievance to oppose Defendant Valent's discrimination, Defendants retaliated against him by subjecting his work to heightened scrutiny and writing him up for as many petty infractions as they could come up with, and by calling the police to intimidate and traumatize him.

134. The manner in which Plaintiff opposed the discrimination did not disrupt or interfere with Defendants' legitimate business concerns.

135. There is a causal connection between the protected activity and the adverse employment actions.

136. Defendants' retaliatory actions against Plaintiff were done with malice or with reckless indifference to Plaintiff's federally protected rights.

137. Plaintiff has not previously initiated a complaint for the relief claimed herein before any other court.

138. Plaintiff therefore seeks affirmative relief, back pay, lost future wages, compensatory damages, punitive damages, attorneys' and experts' fees, costs and disbursements, and such other and further relief that this Court deems just and proper.

**PLAINTIFF'S FIFTH CLAIM FOR RETALIATION UNDER NYSHRL**

139. Plaintiff repeats and realleges each and every allegation stated or contained in Paragraphs "1" through "138" above as though fully set forth at length herein.

140. Sections 296(1)(e) and (7) of the New York State Human Rights Law ("NYSHRL") makes it an unlawful discriminatory practice for an employer to discriminate against an employee because said employee has opposed discrimination based on race or the creation of a racially hostile work environment through the filing of a complaint or providing testimony or assistance in any proceeding under the statute.

141. Discrimination on the basis of race and color are forbidden under NYSHRL.

142. Plaintiff engaged in protected activity under NYSHRL by opposing discrimination and hostile work environment when he grieved the unjustified discipline he was being subjected to wherein he, his union attorney, and the arbiter raised discrimination and racism as a motivator for the excessive discipline.

143. Each time Plaintiff filed a grievance to oppose Defendant Valent's discrimination, Defendants retaliated against him by subjecting his work to heightened scrutiny and writing him up for as many petty infractions as they could come up with, and by having the police intimidate and traumatize him.

144. The manner in which Plaintiff opposed the discrimination did not disrupt or interfere with Defendants' legitimate business concerns.

145. There is a causal connection between the protected activity and the adverse employment actions.

146. Defendants' retaliatory actions against Plaintiff were done with malice or with reckless indifference to Plaintiff's rights protected under New York State law.

147. Plaintiff has not previously initiated a complaint for the relief claimed herein before any other court.

148. Plaintiff therefore seeks affirmative relief, back pay and lost future wages, compensatory damages, costs and disbursements, and such other and further relief as this Court deems just and proper.

**PLAINTIFF'S SIXTH CLAIM FOR DISPARATE IMPACT UNDER TITLE VII**

149. Plaintiff repeats and realleges each and every allegation stated or contained in Paragraphs "1" through "148" above as though fully set forth at length herein.

150. Title VII of the Civil Rights Act of 1964 makes it an unlawful discriminatory practice to limit, segregate or classify employees in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's race or color.

151. Defendants' employment practice of not promoting African American/Black workers to the positions of full-time drivers at the New Windsor Location causes a disparate impact on the basis of race and color, to wit, out of the approximately sixty (60) full time drivers at the New Windsor Location, there are presently only about four (4) that are African American/Black and two (2) of those drivers were just recently hired in the past year.

152. The practice of hiring only Caucasian drivers to the full-time positions at the New Windsor Location is not job related nor consistent with business necessity.

153. Plaintiff has been damaged by Defendant's employment practices in that said practices have created an atmosphere where the two (2) to four (4) African American/Black, full-time drivers feel that they are not valued by the company, that their jobs are not stable, and that they cannot complain about discrimination because they are "lucky" to be one of the few African American/Black drivers hired to full-time at that location.

154. Plaintiff has not previously initiated a complaint for the relief claimed herein before any other court.

155. Therefore, Plaintiff respectfully requests affirmative relief, back pay, lost future wages, compensatory damages, punitive damages, attorneys' and expert fees, costs and disbursements, and such other and further relief that this Court deems just and proper.

**SEVENTH CLAIM FOR RELIEF FOR AIDING AND ABETTING UNDER NYSHRL**

156. Plaintiff repeats and realleges each and every allegation stated or contained in Paragraphs "1" through "155" above as though fully set forth at length herein.

157. Section 296(6) of the NYSHRL makes it an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing or attempts to do any of the acts forbidden by NYSHRL Sections 290, *et seq*.

158. Pursuant to the claims made above, Defendant Valent acted to aid and abet the discriminatory and retaliatory actions of Defendants UPS in violation of the NYSHRL.

159. Therefore, Plaintiff respectfully requests affirmative relief, back pay, lost future wages, compensatory damages, costs and disbursements, and such other and further relief that this Court deems just and proper.

**JURY DEMAND**

160. Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff prays that this Honorable Court:

a. Accept jurisdiction over this matter;

b. Empanel a jury to fairly hear and decide this matter;

c. Award Plaintiff back pay and front pay;

d. Award Plaintiff compensatory damages sustained as a result of Defendants' discriminatory practices;

e. Award Plaintiff punitive damages for Defendants' willful and outrageous conduct;

f. Award Plaintiff damages against Defendant Christopher Valent for aider and abettor liability under the New York State Human Rights Law;

g. Award Plaintiff reasonable attorneys' fees;

h. Award Plaintiff costs and disbursements of this action; and

i. Award any other and further relief that this Court deems just and proper.

Dated: Warwick, New York
August 31, 2019

JENNIFER ECHEVARRIA (JE5544)
Echevarria Law, PLLC
Attorney for Plaintiff
P.O. Box 1053
Warwick, New York 10990
(T) 845-544-7644
(E) EchevarriaLaw@optimum.net

**VERIFICATION**

STATE OF NEW YORK )
) SS.:
COUNTY OF ORANGE )

Barry Wilkins, being duly sworn, says:

I am the Plaintiff in the action herein.

I have read the annexed Verified Complaint dated August 31, 2019, know the contents thereof and the same are true to my knowledge, except those matters therein which are alleged upon information and belief and as to those matters I believe them to be true.

BARRY WILKINS

Sworn to before me this
31 day of August, 2019

NOTARY PUBLIC

JENNIFER S. ECHEVARRIA
Notary Public, State of New York
No. 02EC6265405
Qualified in Orange County
My Commission Expires ~~July 9, 20~~ October 13, 2021