UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
BARRY WILKINS,                                     :
                    Plaintiff,               :
v.                                                 :
                                         :   **OPINION AND ORDER**
UNITED PARCEL SERVICE, INC., doing                 :
business as UPS; UNITED PARCEL SERVICE             :   19 CV 8180 (VB)
OF AMERICA, INC.; and CHRISTOPHER                  :
VALENT,                                            :
                    Defendants.              :
-------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Barry Wilkins brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), Section 296 of the New York State Human Rights Law ("NYSHRL"), and 42 U.S.C. § 1981 ("Section 1981"), alleging defendants United Parcel Service, Inc. ("UPS"), United Parcel Service of America, Inc. ("UPSA"), and Christopher Valent discriminated and retaliated against him based on his race.

      Before the Court are defendants' motion for summary judgment (Doc. #47), as well as defendants' motions to strike plaintiff's declaration (Doc. #69) and certain portions of the declaration of plaintiff's attorney, Jennifer S. Echevarria (Doc. #67).  The motions to strike were filed in opposition to defendants' motion for summary judgment.

      For the reasons set forth below, the motion for summary judgment is GRANTED IN PART and DENIED IN PART, and the motions to strike are TERMINATED AS MOOT.[1]

---

[1]    The Court notes that the myriad evidentiary challenges in defendants' voluminous motions to strike are procedurally inappropriate, more appropriate for a motion in limine in advance of trial, and an apparent attempt to circumvent the Court's page limits for a motion for summary judgment.  Accordingly, the Court declines to consider the motions to strike at this time.  See Watts v. City of Hartford, 2004 WL 717132, at *2 (D. Conn. Mar. 31, 2004) ("[A] court may choose to deny a motion to strike and give the challenged materials whatever consideration may be appropriate in analyzing the motion for summary judgment.").

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and affidavits and declarations with exhibits, which together reflect the following factual background.

I.     UPS Organizational Structure and Disciplinary System

Plaintiff, a Black man, has been employed by UPS as a full-time package car driver from 1998 to the present, working out of UPS's facility in New Windsor, New York.  Plaintiff is represented by the Teamsters union.

Package car drivers at UPS report to "on-car supervisors," who, in turn, report to "business managers" (sometimes also referred to as "center managers"), who, in turn, report to "division managers."  (Doc. # 60 ("Echevarria Decl.") Ex. 7 ("Pl. Tr.") at 60–62).[2]  During the at-issue time period from 2015 to 2017, plaintiff reported to multiple on-car supervisors. Plaintiff's business manager was defendant Valent, a white man, and his division manager was Bill Bibbs, a Black man.  David Scala, a white driver at the New Windsor facility, was plaintiff's shop steward during the relevant time period.  Scala's responsibilities as shop steward included attending and advocating for fellow drivers in both disciplinary and grievance procedures at UPS.

Package car drivers at UPS are trained to follow a series of policies and directives governing their conduct, including workplace violence policies, honesty policies, and standards for the delivery of packages.  A driver's violation of such policies generally triggers a form of discipline from UPS, the severity of which is keyed to the disciplinary history of the driver.

---

[2]     Citations to "Pl. Tr. at _" refer to the page number on the top right-hand corner of each transcript page.

II.     Plaintiff's Disciplinary and Grievance History

        A.     Pre-Valent (1998 to September 2015)

Although the parties dispute the exact number, it is clear plaintiff was involved in, at most, twenty-seven incidents of discipline over the seventeen years plaintiff worked as a full-time package car driver at the New Windsor facility prior to Valent's arrival in September 2015. These incidents of discipline entailed offenses that ranged from committing avoidable accidents to one instance of making a threat of physical violence to another co-worker.

        B.     Valent's Tenure as Business Manager (September 2015 to May 2017)

Over the course of the almost twenty months Valent was business manager at the New Windsor facility from September 2015 to May 2017, plaintiff received at least sixteen notices of discharge or suspension, alongside other types of informal discipline and scrutiny.

In one instance of informal discipline or scrutiny on an unspecified date in June 2016, Valent called plaintiff up and began questioning him on how he was able to manipulate his schedule to maximize his hours and pay, suggesting plaintiff was incentivized to do so to pay for his "whips," which was a reference to plaintiff's vintage cars.  (Echevarria Decl. Ex. 11 ("Valent Tr.") 28–30).

In an instance of formal discipline on June 17, 2016, plaintiff was immediately suspended without pay for alleged "workplace violence."  That morning, plaintiff participated in a meeting with Valent, division manager Bibbs, and shop steward Scala, among others, intended to review the "hundreds" of delivery infractions Valent purportedly observed plaintiff commit during a recent delivery ride supervised by Valent.  (Doc. #49 ("Def. 56.1") ¶ 50).  As the meeting went on, plaintiff became increasingly frustrated with what he believed to be the unfair scrutiny of his performance until he abruptly left the meeting.

Shortly thereafter, Valent and Bibbs overheard plaintiff discussing with Scala the idea of "punching" and "cutting" or "slitting someone's throat." (Def. 56.1¶ 56). Valent and Bibbs reported the exchange to upper management at UPS, who in turn directed Valent to call the police. A number of law enforcement officials arrived on the scene in several trucks and cars, but plaintiff was never arrested.

An "incident detail report" by the Orange County Division of Emergency Communications memorialized Valent's 911 call. The report noted in the "comments" section that, among other things, there was a "knife invl: threat to cut throat" and "wpns involved." (Echevarria Decl. Ex. 3). However, Valent testified he never observed plaintiff with a knife at that time, and never relayed such a fact to law enforcement. Plaintiff was initially suspended indefinitely for the "threat," but plaintiff challenged his discipline in arbitration and eventually had his position restored after eight weeks with back pay.

C.    Post-Valent (May 2017 to Present)

In May 2017, Valent was transferred to another facility. The record reflects that from May 2017 through the present, plaintiff has been involved in four incidents of discipline, one of which involved plaintiff accidentally striking and killing a dog.

D.    Grievances

During Valent's tenure as business manager, plaintiff filed at least eight grievances through his union regarding the purportedly excessive discipline he was accruing. Six of the eight grievances referenced Valent by name, and all of the grievances complained of some combination of "intimidation," "harassment," and "discrimination." (Doc. #59 ("Pl. Decl.") Ex. 3).

Only one of plaintiff's grievances, dated April 14, 2016, cited to a specific provision in the Teamsters' collective bargaining agreement ("CBA") regarding race-based discrimination; the remaining grievances in the record cited to a separate provision of the CBA addressing general employee-management relations and a prohibition against overly supervising union members.

During his deposition, plaintiff testified he filed an additional grievance on an unspecified date in June 2016 to complain of Valent's use of the term "whip." The record does not contain the grievance, and plaintiff did not elaborate on what he stated in the grievance. Plaintiff testified that the day after he filed his grievance, Valent asked him to withdraw it, but plaintiff refused.

III.   Factual Disputes as to Hostile Work Environment

Plaintiff offers evidence that Valent subjected him to a "flurry" of formal and informal disciplinary actions allegedly on the basis of his race (Doc. #58 ("Pl. 56.1") ¶ 18), culminating in the June 17, 2016, incident in which Valent allegedly fabricated a story of plaintiff threatening him with a knife.

Defendants, on the other hand, offer evidence that plaintiff was a poor performer with a history of allegedly violent threats who merely continued being violent and bad at his job under Valent, who, in any event, was not even responsible for all of the incidents of discipline in which plaintiff was involved.

A.   Responsibility for Discipline

As an initial matter, the parties dispute whether Valent was involved in all of plaintiff's formal incidents of discipline during Valent's tenure as business manager.

Defendants point to:  (i) plaintiff's formal notices of discipline in the record, which bear only the signature of the New Windsor division manager, <u>not</u> the business manager; and (ii) the warning or investigatory letters issued to plaintiff that contain observations made by plaintiff's on-car supervisors, but again not the business manager.

Plaintiff, on the other hand, contends responsibility for disciplinary actions, in practice, resided squarely with Valent.  Plaintiff relies on:  (i) Scala's testimony that, in his experience as shop steward and advocate for package car drivers at disciplinary proceedings, the business manager was responsible for all discipline that took place at the facility; (ii) Valent's sworn declaration in which he takes responsibility for certain notices of discipline in the record notwithstanding that his name does not appear on those notices; and (iii) testimony from Scala and Michael Townes (another Black package car driver) that drivers were brought into Valent's office every morning for discipline, irrespective of whether an on-car supervisor was the one who observed the grounds for discipline.

B.    <u>Race-Based Animus Behind Discipline</u>

The parties also dispute whether plaintiff received any of the above-referenced incidents of discipline because of his race.

Plaintiff relies, in part, on evidence reflecting independent complaints of disparate treatment against Valent from other drivers at the New Windsor facility, including:

(i)    Scala's deposition testimony that, in his capacity as shop steward, he observed plaintiff and the other minority drivers at the New Windsor facility being called into Valent's office for discipline much more frequently than white drivers, even when white drivers committed the same offenses.

6

(ii)     Townes's deposition testimony that he also was regularly called into Valent's office for relatively mundane offenses, such as failing to pick up the bill for international packages, while white drivers escaped discipline for committing similar infractions.

(iii)    A UPS "Ethics and Compliance Reporting" form memorializing a telephone complaint made to UPS on February 15, 2016, in which Arthur Rivera, a Hispanic package car driver at the New Windsor facility, complained Valent had unfairly targeted him as part of a pattern of selective discipline directed against minorities.

(iv)     A March 9, 2018, memorandum drafted by an Equal Employment Opportunity Commission ("EEOC") investigator memorializing a conversation with Hector Iglesias, another Hispanic driver at the New Windsor facility, who complained Valent assigned more difficult tasks to him while "[t]he white guys were not forced to work hard."  (Echevarria Decl. Ex. 6).

Relying on deposition testimony and sworn statements in the parties' declarations, plaintiff also points to specific, personal incidents of disparate treatment during Valent's tenure as business manager, specifically:

(i)      On or around May 24, 2016, plaintiff received a notice of discipline for failing to wear proper footwear during a meeting that day, in violation of UPS's appearance standard.  Scala and Peter Griffin, both white drivers, confirmed in their depositions they attended the same meeting and wore similar sneakers as plaintiff, yet received no such discipline.

(ii)     Plaintiff testified that on an unspecified date in early 2016, Valent verbally disciplined plaintiff for purportedly "stealing time" during a training session at the

New Windsor facility by sitting down in the computer room and failing to complete the training, notwithstanding that at least one other white driver, Mike Drake, was not disciplined for the same behavior.  (Pl. Tr. 191).

(iii)    On February 2, 2016, plaintiff received a notice of discharge after he reported a customer complaint that he had gotten tire marks on the customer's property. Plaintiff testified that at some point thereafter, a white driver escaped discipline for a more consequential accident in which he backed into another car and failed to report it.

(iv)    Plaintiff testified that on or around September 29, 2016, Valent issued plaintiff a notice of discipline for leaving the back door of his truck open, in violation of UPS standards.  Plaintiff testified that on the same day, his friend Rosenberger, another white package driver, admitted to plaintiff he received no such discipline for driving with packages in the cab of his truck, which would have also violated UPS standards.

Defendants, on the other hand, insist any differences in treatment between a minority driver and a particular white driver should be attributed to either differences in prior disciplinary history between the two, such that the minority driver would already be more likely to receive more severe discipline for a given infraction, or ad-hoc differences in how the drivers' union resolved the discipline respecting each driver.  Defendants further point to evidence reflecting Valent's history of disciplining white drivers and granting leniency to other Black drivers.

    C.    <u>June 17, 2016, Police Incident and Suspension</u>

The parties dispute the content and context of plaintiff's alleged "threat" made on June 17, 2016, as well as the context in which Valent called the police.

On the one hand, defendants point to deposition testimony from Valent and a sworn statement from division manager Bibbs confirming that after plaintiff left the meeting that morning, plaintiff was yelling and gesturing over to Scala while exclaiming—within earshot of Valent and Bibbs—"I am gonna punch out and cut his fucking throat!"  (Echevarria Decl. Ex. 11 ("Valent Tr.") 44); (Doc. #51 ("Clark Decl.") Ex. 13).

Plaintiff, on the other hand, insists he merely vented to Scala out of frustration, "What do you have to do [to get someone's attention], punch somebody in the face or slit their throat?" (Pl. Tr. 279).  Scala added during his deposition that it would have been difficult for Valent or Bibbs to hear exactly what plaintiff said at all over the sound of Scala's truck engine at the time.

Plaintiff also maintains Valent purposely lied to the police by claiming plaintiff was wielding a knife when making his supposed threat, as the incident report referenced an individual on scene with a knife, and Valent was the only UPS employee in contact with the police.

## DISCUSSION

I.   Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[3]

---

[3]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary

judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion

Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  Bald assertions, completely unsupported by

admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923

F.2d 18, 21 (2d Cir. 1991).

     In deciding a motion for summary judgment, the Court need consider only evidence that

would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736,

746 (2d Cir. 1998).  However, the nonmoving party need not "produce evidence in a form that

would be admissible at trial."  Celotex Corp. v. Catrett, 477 U.S. at 325.

II.    Claims against UPSA and all "Race Discrimination Claims" under Title VII, NYSHRL,
      and Section 1981

     Defendants argue plaintiff's claims against UPSA, and all of plaintiff's non-hostile work

environment "race discrimination claims" under Title VII, Section 1981, and the NYSHRL

should be deemed abandoned.

     The Court agrees.

     "Federal courts may deem a claim abandoned when a party moves for summary judgment

on one ground and the party opposing summary judgment fails to address the argument in any

way."  Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015) (granting

summary judgment on claims because of plaintiff's failure to respond to defendant's arguments).

     Here, defendants move for summary judgment on all of plaintiff's claims against UPSA

because UPSA was never plaintiff's employer.  Plaintiff has not responded to this argument.

     Defendants have also moved on plaintiff's non-hostile work environment "race

discrimination claims" under Title VII, Section 1981, and the NYSHRL, on several grounds.

Although it is not clear the complaint even asserts claims under Title VII and the NYSHRL

independent of plaintiff's hostile work environment claims,[4] plaintiff, in any event, has not responded to defendants' arguments regarding such claims.

Accordingly, the Court deems plaintiff's claims against UPSA, plaintiff's claims under Section 1981,[5] and plaintiff's non-hostile work environment "race discrimination claims" under Title VII and Section 1981 as abandoned, and all such claims must be dismissed.

III.   Title VII Hostile Work Environment Claim

Defendants argue plaintiff cannot as a matter of law establish a Title VII hostile work environment claim against UPS because no reasonable jury could conclude plaintiff was subject to a hostile work environment because of his race; and even if it could so conclude, UPS is not subject to any liability.

The Court disagrees.

A.   Legal Standard

To demonstrate a hostile work environment claim under Title VII, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014).

---

[4]      Plaintiff's second and third claims in the complaint are for "hostile work environment and discrimination under" Title VII and the NYSHRL, respectively, but the allegations in each claim are clearly grounded in a "hostile work environment."  (Doc. #1).

[5]      In their motion papers, the parties discuss a possible hostile work environment claim under Section 1981, but the only claim in the complaint under Section 1981 is the third claim for "intentional discrimination."  (Doc. #1).  Unlike the Title VII and NYSHRL claims, the allegations under the Section 1981 claim make no reference to "hostile work environment." Accordingly, the Court declines to construe the complaint as asserting a hostile work environment claim under Section 1981.

"[T]he test has objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 20.

In considering whether a plaintiff has met this burden, courts should examine the totality of the circumstances, including:  "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 20.  Moreover, "as a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

It is "axiomatic" however, that a plaintiff asserting a hostile work environment claim under Title VII must show sufficient evidence the at-issue conduct occurred because of the plaintiff's protected characteristic.  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  An inference of discriminatory intent may be derived from a variety of circumstances, including, "invidious comments about others in the employee's protected group," or "the more favorable treatment of employees not in the protected group," or "the sequence of events leading to the plaintiff's discharge."  Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

Under Title VII, "an employer's liability for such harassment may depend on the status of the harasser."  Vance v. Ball State Univ., 570 U.S. 421, 424 (2013).  In cases in which the harasser is a "supervisor," an employer is strictly liable if the harassment culminates in a "tangible employment action."  Id.

An employee is considered a "supervisor" "when he or she is "empowered" to take tangible employment actions against the victim.  Vance v. Ball State Univ., 570 U.S. at 431.  A "tangible employment action," in turn, constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Id.

The "lost use of wages for a period of time is, by itself, an economic injury that can qualify as a tangible employment action," even if the employee is subsequently reimbursed for the lost wages.  Min Jin v. Metro. Life Ins. Co., 310 F.3d 84, 100–01 (2d Cir. 2002) ("[T]he loss of an expected steady income can clearly have a serious enough economic impact to change significantly a person's employment status.").

> B.     Analysis

>> 1.     Underlying Hostile Work Environment

Here, defendants do not dispute plaintiff subjectively perceived his workplace as hostile, but they do dispute whether the alleged harassment was objectively severe or pervasive and based on plaintiff's race.  Defendants also dispute whether UPS is liable for Valent's alleged conduct.  The Court addresses these arguments in turn.

>>> a.     Objectively Severe or Pervasive

Here, the record reflects that, even accepting as true defendants' accounting of plaintiff's disciplinary history, plaintiff's annual rate of discipline increased four-fold under Valent compared to the rate at which plaintiff was disciplined over the course of his seventeen-year career up to that point.  This heightened scrutiny was corroborated by deposition testimony of two of plaintiff's fellow package car drivers, one who recalled that plaintiff was called into

Valent's office for discipline seemingly every day, and another who described Valent's treatment of plaintiff as "an all-out assault."  (Echevarria Decl. Ex. 10 ("Griffin Tr.") 25).

Viewed in a light most favorable to plaintiff, the totality of this evidence, including plaintiff's June 17, 2016, suspension and brush with the police, evinces a barrage of unfair discipline that is "sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d at 374.  Put another way, "the speed with which these incidents occurred following [Valent's] arrival at the office and their sheer frequency over the course of [twenty] months raises at least an issue of triable fact in terms of altering the conditions of Plaintiff's employment to create a hostile work environment."  Krishnapillai v. Donahoe, 2013 WL 5423724, at *17 (E.D.N.Y. Sept. 26, 2013) (evidence that "following many years of apparently excellent professional service to the Postal Service, Plaintiff was . . . repeatedly and regularly harassed, belittled, unfairly criticized and reprimanded" was sufficient to establish objective element of hostile work environment claim).

b.    <u>Hostility Based on Race</u>

Although a closer call, plaintiff has also shown sufficient evidence to raise a genuine issue of material fact as to whether he was subject to disparate discipline because of his race.

Here, although lacking any facially racist comments or other direct evidence of racism, plaintiff supplies sufficient circumstantial evidence that Valent targeted plaintiff and other minority package car drivers at UPS for discipline more frequently than he did similarly situated white drivers committing similar offenses.  See Alfano v. Costello, 294 F.3d at  377. Specifically,

(i)      Plaintiff identified through deposition and documentary evidence at least four

               instances in which he was disciplined for relatively mundane or commonplace

infractions, and for which similarly situated white drivers either received less severe discipline than plaintiff or escaped discipline entirely.

(ii)     Plaintiff introduced independent accounts from at least three other minority drivers at the New Windsor facility asserting a similar pattern of disparate treatment and discipline from Valent.

(iii)    Plaintiff also showed deposition testimony from David Scala that, based on his observations as shop steward, plaintiff and other minority drivers were disciplined far more frequently than white drivers for substantially similar infractions.

In short, taken together and viewed in a light most favorable to plaintiff, plaintiff's own accounts of disparate discipline by Valent, the independent accusations of disparate treatment against Valent by other minority drivers, and the corroboration by Scala based on his experience and observations as shop steward raise a triable issue of race-based animus.  See Alfano v. Costello, 294 F.3d at 377 ("[I]t may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [his] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent.").[6]

---

[6]     Defendants argue plaintiff cannot "avoid proving his disparate treatment claim by simply listing it as one type of harassment."  (Doc. #65).  While true, defendants ignore that a hostile work environment claim requires an examination of the totality of the circumstances. Accordingly, whereas comments or other evidence of racial discrimination "may not establish an inference of discrimination specifically regarding [a specific] adverse employment action," they may "nevertheless, in the broader context of incidents, and relieved of the requirement of establishing a nexus with one specific act, . . . add to a record that could allow for" a finding of race-based animus.  Krishnapillai v. Donahoe, 2013 WL 5423724, at *17.

2.      UPS's Liability

Here, defendants do not dispute that Valent is a "supervisor" under Title VII, but they do argue that, assuming there was a hostile work environment, it did not result in a "tangible employment action" such that UPS could be held strictly liable.

The Court disagrees.

Here, as discussed above, plaintiff has shown sufficient evidence to raise a genuine issue of material fact as to whether plaintiff's eight-week suspension following the June 17, 2016, "workplace violence" incident was part and parcel of Valent's harassment against plaintiff.  An eight-week suspension without pay is plainly the type of "significant change in benefits" that constitutes a "tangible employment action."  Moreover, plaintiff's reinstatement with back pay does not cure the employment action, as it cannot erase "the loss of an expected steady income" plaintiff endured for those eight weeks.  Min Jin v. Metro. Life Ins. Co., 310 F.3d at 100–01.

Accordingly, plaintiff's hostile work environment claim under Title VII against UPS may proceed.

IV.   NYSHRL Hostile Work Environment Claims

Defendants contend they are entitled to judgment as a matter of law on plaintiff's NYSHRL claims.

The Court agrees with respect to UPS, but disagrees with respect to Valent.

A.      Legal Standard

The underlying elements of a hostile work environment claim are governed by the same standard whether the claim is brought under Title VII or the NYSHRL.  Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).  However, the NYSHRL differs from Title VII in determining liability for both individuals and employers.

First, under the NYSHRL, "an employer is never strictly liable for the conduct of its employees, even if the harassing employee is a Plaintiff's supervisor." Marchuk v. Faruqi & Faruqi, LLP, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015).  Rather, an employer is only liable for discriminatory conduct of the employee when the conduct is "encouraged, condoned, or [expressly or impliedly] approved" by the employer."  See State Div. of Hum. Rts. ex rel. Greene v. St. Elizabeth's Hosp., 66 N.Y.2d 684, 687 (1985).  "Condoning" discriminatory conduct "contemplates a knowing, after-the-fact forgiveness or acceptance of an offense," which may entail "calculated inaction in response to discriminatory conduct."  Id.

Second, unlike Title VII, the NYSHRL allows for individual liability if the defendant (i) has an "ownership interest" in the employer or the authority to "hire or fire" employees or otherwise "do more than carry out personnel decisions made by others," Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742; or (ii) aided or abetted conduct giving rise to a claim of discrimination. N.Y. Exec. Law § 296(6).

 B. Analysis

  1. Underlying Hostile Work Environment

Here, because plaintiff has already shown sufficient evidence upon which a reasonable jury could find in his favor on the underlying elements of a hostile work environment claim

under Title VII, as discussed above, plaintiff has also done the same with respect to the NYSHRL claims.

        2.      UPS's Liability

Nevertheless, plaintiff has not raised a triable issue that UPS encouraged or accepted Valent's actions "knowing" the discriminatory animus binding them together. State Div. of Hum. Rts. ex rel. Greene v. St. Elizabeth's Hosp., 66 N.Y.2d at 687.

As defendants note, the record contains eight grievances plaintiff filed against Valent that could have put UPS on notice of Valent's harassment, but the grievances supply sparse detail respecting the complained-of conduct beyond conclusory references to "harassment," "intimidation," or, in the case of only three of the eight grievances, "discrimination." Moreover, only one of the eight grievances cited to the appropriate anti-discrimination section of plaintiff's CBA, and only one grievance reflected that plaintiff actually escalated his complaint to management past the filing stage, as plaintiff was required to do. (Pl. Decl. Ex. 3). Such vague and conclusory grievances fail as matter of law to alert an employer to discriminatory wrongdoing.

Plaintiff also points to UPS management's purported instruction to Valent to call the police on June 17, 2016, as an indication of "encouragement" or "approval" of Valent's behavior, but the record evidence raises the opposite inference—it was Valent, not UPS, who overheard and then allegedly mischaracterized plaintiff's "slitting throats" comment as a threat.

Finally, plaintiff also cites to deposition testimony from Michael Townes and Peter Griffin suggesting there was a "locker room" or "boys' club" culture of unspecified slurs at the New Windsor facility that UPS condoned, but neither witness was able to recall a specific

instance in which they directly heard a specific individual utter a specific slur.  (See, e.g., Echevarria Decl. Ex. 9 ("Townes Tr.") 42-45, 97; Griffin Tr. 39–40).

Accordingly, plaintiff's hostile work environment claim against UPS under the NYSHRL must be dismissed.

### 3.    Valent's Direct Liability

Here, Valent's ability to "hire or fire" employees or otherwise make personnel decisions, such that he can be found individually liable under the NYSHRL, does not appear to be in dispute.  See Tomka v. Seiler Corp., 66 F.3d at 1317.  Indeed, defendants admit in their statement of undisputed material facts that Valent "terminated" the employment of at least three drivers at UPS:  plaintiff himself (Def. 56.1 ¶ 68); Anthony Joyce, a white driver (id. ¶¶ 87, 101); and Frank King, a Black driver.  (id. ¶ 103).

Accordingly, plaintiff's hostile work environment claims against UPS must be dismissed, but his hostile work environment claims against Valent may proceed.[7]

## V.    Title VII and NYSHRL Retaliation Claims

Defendants argue the Court must grant summary judgment on plaintiff's retaliation claims because plaintiff fails to show sufficient evidence that Valent called the police on June 17, 2016, because of the several grievances plaintiff had filed against him to that point, and that

---

[7]    Plaintiff also asserts a seventh claim for aiding and abetting UPS's discriminatory actions under the NYSHRL.  However, an individual employee cannot be liable for both discrimination under the NYSHRL and aiding and abetting discrimination under the NYSHRL based on the same conduct.  Hardwick v. Auriemma, 116 A.D.3d 465, 468 (1st Dep't 2014).  Here, the Court has already determined that plaintiff fails as a matter of law to establish that UPS engaged in independently discriminatory conduct.  Accordingly, plaintiff's aiding and abetting claim must be dismissed.

Valent escalated his course of discipline against plaintiff <u>because</u> plaintiff successfully contested his discharge for the June 17, 2016, incident in arbitration.

The Court agrees.

A.    <u>Legal Standard</u>

Claims for retaliation under Title VII and the NYSHRL are both governed by the burden-shifting framework laid out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

To make out a prima facie case of retaliation under Title VII or the NYSHRL, a plaintiff must show: "(1) [ ]he engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity." <u>Summa v. Hofstra Univ.</u>, 708 F.3d 115, 125 (2d Cir. 2013).

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." <u>Raniola v. Bratton</u>, 243 F.3d 610, 625 (2d Cir. 2001).  If the employer demonstrates a legitimate, non-discriminatory reason for the action, then "[t]he burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." <u>Id</u>.

A "protected activity" entails "action taken to protest or oppose statutorily prohibited discrimination." <u>Jarrell v. Hosp. for Special Care</u>, 626 F. App'x 308, 311 (2d Cir. 2015). "Therefore, mere complaints of unfair treatment by an individual are not protected speech." <u>Aspilaire v. Wyeth Pharms., Inc.</u>, 612 F. Supp. 2d 289, 308 (S.D.N.Y. 2009) (citing <u>Ezekwo v. N.Y.C. Health & Hosps. Corp.</u>, 940 F.2d 775, 781 (2d Cir. 1991)).  "The onus is on the speaker

to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class."  Id. at 308–09.

Temporal proximity between the adverse action and the protected activity may be sufficient to establish a prima facie element of causation on its own.  Parron v. Herbert, 768 F. App'x 75, 77 (2d Cir. 2019).  But "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Chung v. City Univ. of New York, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order).

Moreover, once the employer has demonstrated that a legitimate, non-retaliatory reason existed for the action, temporal proximity alone is no longer sufficient to establish pretext. Parron v. Herbert, 768 F. App'x at 77.

      B.     Analysis

          1.     June 17, 2016, Police Phone Call

Here, plaintiff fails to show sufficient evidence that defendants' proffered non-discriminatory reason for calling the police on this day—namely, that plaintiff made a violent threat in the workplace—was pretext for retaliation against plaintiff for his prior grievances.

As an initial matter, plaintiff can show that only two of his grievances prior to the June 17, 2016, incident indeed constitute "protected activities":  (i) the grievance filed on April 15, 2016, under Article 36 of the CBA (the anti-discrimination section), and (ii) the grievance that plaintiff testified he filed on an unspecified date in June 2016 regarding Valent's reference to

"whips," which, according to plaintiff, Valent purposely used because he thought it was a term commonly used by Black Americans.[8]

However, even assuming plaintiff has otherwise made out a prima facie case for retaliation, he cannot supply sufficient evidence that plaintiff's remarks about punching someone and slitting someone's throat—defendants' proffered non-discriminatory reason for the call— was mere pretext for retaliating for the filing of those two grievances.  To the contrary, aside from the temporal proximity of the two grievances to the June 2016 incident, the only other evidence in the record suggesting plaintiff's grievances <u>caused</u> Valent to call the police that day is plaintiff's deposition testimony that one day after he filed his grievance regarding the "whip," Valent called plaintiff and asked him to "get rid of" the grievance, which defendant refused to do.  (Pl. Tr. 242).  Such evidence, however, without more, is insufficient to create an inference of causation.

Accordingly, plaintiff's retaliation claim arising out of Valent's June 17, 2016,  phone call to the police must be dismissed.

### 2.    Heightened Discipline and Scrutiny

Even assuming plaintiff's successful challenge to his suspension for the June 17 2016, incident constituted a protected activity, plaintiff argues only that Valent retaliated against plaintiff by issuing more of the same type of disciplinary actions that prompted plaintiff's challenge in the first place.  Plaintiff thus fails to establish the element of causation.  <u>See Chung</u>

---

[8]    As discussed above, the remaining grievances in the record all cite to the general employee-relations section of the CBA and all complain of general harassment, intimidation, or discrimination without any suggestion of race-based discrimination.  Accordingly, plaintiff's "undisclosed belief of [discriminatory treatment regarding these incidents] will not convert [those] ordinary employment complaint[s] into a protected activity."  <u>Aspilaire v. Wyeth Pharms., Inc.</u>, 612 F. Supp. 2d at 309.

v. City Univ. of New York, 605 F. App'x at 24.  ("That [d]efendants allegedly continued [to discipline plaintiff] after he filed a discrimination complaint cannot support an inference that the later-in-time actions were motivated by retaliatory intent.") .

Accordingly, plaintiff's retaliation claim arising out of the August 2016 arbitration must be dismissed.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's Title VII hostile work environment claim against defendant UPS and his NYSHRL hostile work environment claim against defendant Valent shall proceed.  All other claims are dismissed.

The motions to strike are TERMINATED AS MOOT.

The Court will conduct a case management conference on **April 8, 2022, at 10:00 a.m.**, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what efforts they have made or will make to settle this case.  The conference will be held at the White Plains Courthouse, Courtroom 620.

The Clerk is directed to terminate United Parcel Service of America, Inc., as a defendant in this action.

The Clerk is directed to terminate the motions.  (Docs. ##47, 67, 69).

Dated: February 28, 2022
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge